UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
        v.                          )   C.R. 18-066-WES-LDA
                                    )
ARIEL ALMONTE                       )
                                    )
_____ )

## MEMORANDUM AND ORDER

On February 28, 2018, Defendant, Ariel Almonte was indicted on charges of possession with intent to distribute a fentanyl and possession of a firearm in furtherance of drug trafficking. See Indictment, ECF No. 9. The charges were partly based on evidence seized from Defendant's residence after Defendant's wife, Williana Pimentel, consented to a search of their shared apartment.

Before the Court is Defendant's Motion to Suppress (ECF No. 18), in which he argues that Pimentel's consent was involuntary because law enforcement officers threatened to take her daughter away if she refused consent. After a hearing on January 17, 2019, the Court requested supplemental briefing on several issues, including whether the independent discovery of the contraband from Almonte's home was inevitable because the police would have obtained a valid search warrant in lieu of consent.[1] For the following reasons, the Court DENIES the motion.

---

[1] The Court also requested supplemental briefing on: (1) whether there was sufficient information available to the CPD

1

I. Factual Background

On February 28, 2018, while conducting surveillance in an unmarked vehicle at a local McDonald's, Detective Dempsey of the Cranston Police Department ("CPD") observed a grey sedan parked in the parking lot and the driver holding a syringe; the driver was later identified as Richard Wiggs. Mot. Suppress Hr'g Tr. ("Hr'g Tr.") 9:20-10:1, 149:4-7, Jan. 17, 2019, ECF No. 27. Det. Dempsey watched as a silver Lexus entered the parking lot and parked behind the sedan. Id. 149:2-9. The Lexus had two passengers: an adult male in the driver's seat, later identified as Defendant Ariel Almonte; and a young girl in the front passenger seat, later identified as Defendant's eleven-year-old step-daughter, A.T. Id. 80:9-21. The driver of the Lexus left his vehicle, approached the grey sedan, leaned into its open driver's-side window, and completed what Det. Dempsey described as a possible "hand-to-hand transaction." Id. 166:10.

At approximately 3:00 p.m. Det. Dempsey radioed another CPD officer, Detective Fuoroli, to ask for back up. When Det. Fuoroli

---

officers on the scene at the time of Almonte's arrest to trigger the good-faith exception to the exclusionary rule; and (2) whether Pimentel was unlawfully detained at the scene of the arrest given that she asked to leave multiple times and was not charged with any crime. Because the parties agree that the good-faith exception does not apply here, the Court need not address that issue. Furthermore, the Court finds that Pimentel's temporary detention was a lawful exercise of the officers' "community caretaking function." See infra, III.a.

arrived ten minutes later, the two officers exited their cars, weapons drawn and badges on display, and commanded Almonte, Wiggs, and A.T. to show their hands. Id. 68:21-25. Almonte dropped a small bag of white powder on the ground as Det. Fuoroli approached and arrested him. Id. 72:1-20. Meanwhile, Det. Dempsey approached Wiggs in his vehicle and observed drug paraphernalia in his car. Id. 158:23-160:13. When questioned, Wiggs stated that Almonte (whom he called "Socio") had just sold him two, $40.00 bags of heroin. Id. 24:7-17.

After obtaining a phone number from A.T., Det. Fuoroli attempted to call A.T.'s mother and Almonte's wife, Williana Pimentel. Id. 86:22. He used his CPD-issued cell phone to make the call and blocked his number before dialing. Id. 87:9-17. When Pimentel did not answer his first call, Det. Fuoroli left her a voice message instructing her to "call the Cranston Police Department back regarding [her] daughter," and providing the phone number for CPD's main line. Id. 26:24-27:4, 87:9-88:24. Det. Fuoroli next called the Department of Children, Youth, and Families ("DCYF") to inform them that he was at the McDonald's on Cranston Street and that he had in his custody a child whose stepfather had just been charged with selling drugs and whose mother was not answering her phone. Id. 92:17-93:21. The DCYF representative allegedly told him that A.T. would not be allowed back in the home until DCYF was sure there was nothing harmful in the house. Id.

3

109:22-110:10. At some point thereafter, Det. Fuoroli attempted to call Pimentel again, but was unsuccessful. Id. 88:10-12.

When Pimentel arrived at the scene thirty minutes later, she immediately went to console A.T., who was visibly upset, and then asked a third CPD officer, Officer Comella, whether she could leave with A.T. Id. 32:13-18; 226:23-227:14. Officer Commella told her "no" and that she "had to wait." Id. 227:11-14. Officer Commella did, however, agree to let A.T. sit in the back of Pimentel's car while they waited for the detectives to come talk to her. Id. 98:1-8. Det. Fuoroli briefly came over to obtain Pimentel's driver's license and confirm her name and address. After providing the requested information, Det. Fuoroli walked away and Pimentel asked Officer Commella if she was free to leave; again, Officer Commella told her "no." Id. 229:1-19.

When Det. Fuoroli returned a few minutes later, Pimentel asked him directly if she could leave with A.T. Id. 101:7-24. He told her "no" and explained that Almonte had been "caught" in the middle of a drug transaction, that CPD had recovered heroin and fentanyl from the scene, and that DCYF had been contacted. Id. 36:22-37:5; 231:20-24. After confirming that she and A.T. shared a residence with Almonte, he asked Pimentel whether there were any weapons or narcotics at the home. Id. 37:9-25. Pimentel denied any knowledge of narcotics at their residence but explained that Almonte used to have a drug problem and stated that he had recently been "drug

4

sick." Id. 38:4-6; 245:21-24. Det. Fuoroli then asked if she would consent to a search of the apartment. Id. 38:15-16. Pimentel claims that she flatly refused and stated "I don't feel comfortable" signing a consent form. Id. 230:13-17. Det. Fuoroli claims that Pimentel's refusal was not so explicit and claims that she only "[s]hrugged her shoulders and huffed and puffed and gave [him] a stare" that lasted approximately twenty seconds. Id. 106:20-23. In any event, Det. Fuoroli responded to Pimentel's reluctance to sign the form by "explaining to her that it would probably be in the best interest of the child that there be no harmful narcotics in the apartment." Id. 38:20-23. In response, Pimentel asked whether DCYF was going to take A.T. away, to which Det. Fuoroli replied that "DCYF was not going to let her back into the apartment until they're satisfied that nothing harmful is in the apartment." Id. 108:20-24, 109:1-3. At that point, Pimentel asked how the search would be conducted and Det. Fuoroli assured her that CPD officers would not "tear apart the apartment, break anything" and that she could "be present during the search." Id. 39:3-12. He then asked Pimentel for a second time if she would consent to a search of the home. 109:1-7. Pimentel verbally consented to the search and Det. Fuoroli briefly left to retrieve the consent form. Id. 39:14-24.

5

When he returned, Det. Fuoroli filled out his information on the form and read its contents to Pimentel before handing it to her. Id. 42:3-4. The form stated, in pertinent part:

> I, Williana Pimentel, having been informed of my rights not to have a search made of the premises and/or vehicle described below without a search warrant and my right to refuse to consent to such a search, do authorize Det. Fuoroli/Det. Dempsey of the Cranston Police Department to conduct a complete search of my premises and/or vehicle . . . .

Gov't Mem. in Supp. of Resp. ("Gov't Mem.") 5, ECF No. 20-1. Before signing, Pimentel asked Det. Fuoroli what would happen if she did not sign the form. Hr'g Tr. 42:5-8. He replied that "more than likely we would have to secure the apartment and we may apply for a search warrant." Id. 42:12-13. Although she admits that she ultimately signed the form, Pimentel testified that she never read the form and that she believed she had to sign the form in order to leave with A.T. Id. 110:14-24, 230:13-231:4, 238:13-24. Pimentel signed the form at 3:50 p.m., at which time, Det. Fuoroli called DCYF to update them about the situation and inform them that they were going to Almonte's apartment. Id. 105:23-106:4. Pimentel was allowed to leave with A.T. and CPD officers followed them to their residence to execute the search of the apartment. Id. 113:12-20. In all, Pimentel spent between ten and thirty minutes at the McDonald's parking lot before she was allowed to leave with A.T. Id. 32:13-18; 95:18-19; 167:16-19.

6

During the search, CPD officers seized heroin, fentanyl, marijuana, various drug paraphernalia, a firearm, and $942.00 in cash, all of which was used to charge Almonte with possession with intent to distribute fentanyl and possession of a firearm in furtherance of drug trafficking. Gov't Mem. 7; see also Criminal Compl., ECF No. 1. After the search, Det. Fuoroli called DCYF for a third time to ensure that A.T. could stay with Pimentel at the apartment, given that narcotics and weapons had been found there. Hr'g Tr. 138:6-18. DCYF told him to release A.T. to her mother and so Det. Fuoroli and the other CPD officers wrapped up the search and left the residence. Id. 138:17-18. Approximately 45 minutes later, a DCYF representative arrived to remove A.T. and place her with her aunt. Id. 237:5-25.

II. Parties' Arguments

Defendant first argues that Pimentel's consent to search the apartment was the direct result of duress and coercion and was therefore not voluntarily given. According to Defendant, CPD officers used inherently coercive tactics to obtain her consent when they repeatedly refused to let her leave the scene with A.T. and then threatened to remove A.T. from her custody unless and until she agreed to the search. Def.'s Mot. Suppress 5-7, ECF No. 18. Second, Defendant argues that the inevitable discovery doctrine does not apply here because CPD officers could not have established probable cause to search his home based only on the

alleged drug transaction in the McDonald's parking lot. Def.'s Supp. Mem. in Supp. of Mot. to Suppress ("Def.'s Supp. Mem.") 15-16, ECF No. 30. Even if they had established probable cause, Defendant contends that there is no evidence that the CPD officers actually considered obtaining a search warrant, even after Pimentel initially refused to consent to the search. Id. at 16.

The government argues that Pimentel's consent, while reluctant, was nonetheless voluntary and valid because the mere presence of some psychological duress does not render consent involuntary. Gov't Mem. 9, 16. Additionally, the government argues that, in the absence of consent, CPD officers would have obtained a search warrant and so the discovery of the contraband from the apartment was inevitable. Gov't Supp. Mem. in Supp. of Obj. to Mot. Suppress ("Gov't Supp. Mem.") 3, ECF No. 21.

III. Discussion

    a. Whether Pimentel's Consent was Voluntary

Consent is an exception to the Fourth Amendment's prohibition on government searches of a person's residence without a warrant. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793 (1990). While consent may be obtained from an occupant or "[a] third party who possesses common authority over the premises." Id. It is undisputed that Pimentel, as Almonte's wife and a cohabiter of the apartment, had authority to consent to a search of the residence. The question is whether Pimentel was subjected

to such inherently coercive tactics in the McDonald's parking lot that her consent was not voluntarily given.

The government bears the burden of proving by a preponderance of the evidence that "consent [to search] was in fact freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Whether consent was voluntarily given is a factual question that turns on a "comprehensive assessment of the totality of the circumstances attending the interaction between defendant/third party and the searching officers." United States v. Perez-Diaz, 848 F.3d. 33, 39 (1st Cir. 2017). "Factors to be weighed in making this comprehensive assessment include, but are not limited to, '(i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics.'" Id. (quoting United States v. Vanvliet, 542 F.3d 259, 264 n.2 (1st Cir. 2008) (citations omitted)). None of these factors are dispositive.

The totality of the circumstances in this case support a finding of voluntary consent. Pimentel is an adult woman who had no difficulty communicating with the CPD officers, and there is nothing about her age, intelligence, or education that would indicate a lack of capacity to consent. Additionally, Det. Fuoroli

testified that he read the consent to search form to Pimentel before she signed it, thereby orally communicating to her the fact that she had the right to refuse consent. Hr'g Tr. 55:19-25. Moreover, when she asked Det. Fuoroli what would happen if she didn't sign, he informed her that CPD officers may apply for a search warrant, indicating that her consent was not required. Id. 42:6-13. Additionally, Pimentel was detained for somewhere between ten and thirty minutes in a public place, in the middle of the afternoon, was never treated as a suspect or target in the officers' investigation and was allowed to remain with her daughter at all times. Accordingly, the first three Vanvliet factors weigh heavily in favor of finding that Pimentel's consent to search the residence was voluntarily given and her will was not overborne.[2]

---

[2] Relatedly, the Court finds that Pimentel's temporary detention was a reasonable exercise of the CPD officers' "community caretaking function." See United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006) (aiding those in distress, combatting actual hazards and preventing potential hazards from materializing are some of the community caretaking functions); United States v. Rodriguez–Morales, 929 F.2d 780, 787 (1st Cir. 1991) (holding that "the need for police to function as community caretakers arises fortuitously, when unexpected circumstances present some transient hazard which must be dealt with on the spot" and that "as long as [the officer's action] pursuant to the community caretaking function is not mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the [action]"). Pimentel was detained for less than thirty minutes for the limited purpose of obtaining identifying information, apprising her of a serious situation that involved both her husband as a suspect and her daughter as a witness, and asking her for consent to search her home. This is a plainly reasonable exercise of the officers' community caretaking functions.

As to the fourth factor, Defendant argues that Det. Fuoroli used inherently coercive tactics to obtain her consent when he threatened to "take" A.T. away if she refused to sign the consent form. Specifically, he argues that, when Pimentel initially refused to sign the form, Det. Fuoroli said: "Well, if you don't sign we're going to take her away." Id. 230:13-20. However, based on all the other facts and circumstances in which this threat was allegedly made, the Court does not find this testimony credible; instead, it credits Det. Fuoroli's version of events.

Det. Fuoroli testified that he informed Pimentel when she arrived that DCYF had already been called and only mentioned DCYF one other time. When Pimentel asked him directly if they were going to take A.T. away, Det. Fuoroli truthfully responded: "DCYF was not going to let her back into the apartment until they're satisfied that nothing harmful is in the apartment." Id. 108:20-24, 109:1-3. This response was based on the information Det. Fuoroli received directly from DCYF during his first phone call with the agency before Pimentel arrived at the scene. Id. 109:22-110:10. Moreover, the record shows that Det. Fuoroli expressed a continuing interest in A.T.'s best interests: He called DCYF once before Pimentel arrived to apprise the agency of the situation; he called DCYF again after Pimentel signed the consent form to update it on the situation and inform the agency that everyone was leaving the McDonald's and moving to Pimentel's residence; and he called

11

DCYF a third time after the search was completed to confirm that A.T. was permitted to stay with Pimentel, even though drugs and a firearm had been found in her home. Pimentel's allegation that he threatened to "take" A.T. if she refused to sign is undermined by Det. Fuoroli's calls to DCYF both before and after Pimentel signed the consent form.

Courts have long recognized that the "psychological coercion generated by concern for a loved one" can affect a person's "capacity for self control." United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) (quotations omitted). Accordingly, "[w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert . . . 'improper influence.'" Id. However, there is a significant difference between conveying accurate information in response to specific questions and "prey[ing] upon the maternal instinct," id.; not every reference to a child or loved one by law enforcement officers in the course of an investigation is inherently coercive.

Here, Det. Fuoroli did not use the specter of removing A.T. to "prey" on Pimentel's maternal instinct; rather, he conveyed accurate information based on what he knew from DCYF at the time. The Court acknowledges that Pimentel was understandably concerned about DCYF's involvement and may have drawn her own conclusions. It finds, however, that the officers did not tell her that DCYF

12

would be called to take her child if she did not consent to the search.  Given the totality of the circumstances, the Court finds that CPD officers did not overbear Pimentel's will or use inherently coercive tactics to obtain Pimentel's consent to search the residence and, therefore, her consent to search the residence was voluntarily given.

    b. Inevitable Discovery Doctrine

The Court also finds that, even in the absence of consent, the contraband recovered from Defendant's residence would inevitably have been discovered through the independent mechanism of a search warrant.

The inevitable discovery doctrine provides:

> Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

United States v. Lee, Cr. No. 17-120 WES, 2018 WL 3873668, at *8 (D.R.I. August 15, 2018) (citing to United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994)).  Here, the parties agree that the only alternative "lawful means" available to CPD officers in this case was to obtain a search warrant for Almonte's home.

13

A search warrant application must reveal probable cause to believe two things: (1) that a crime has occurred and (2) that specified evidence of the crime will be at the search location. See U.S. CONST. amend. IV; United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016). When establishing that specified evidence of a crime will be at the search location, the magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Although "a law enforcement officer's training and experience may yield insights that support a probable cause determination," the First Circuit has "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." United States v. Bain, 874 F.3d 1, 23–24 (1st Cir. 2017), cert. denied, 138 S. Ct. 1593 (2018) (citations omitted). Rather, police must provide additional "specific facts connecting the drug dealing to the home" to establish probable cause for searching the defendant's residence. Id. at 24.

Regardless of whether probable cause existed at the time, the Court must determine whether or not CPD officers would have

actually sought a search warrant for Almonte's residence, had Pimentel refused to consent to the search. United States v. Finucan, 708 F.2d 838, 842 (1st Cir. 1983) (holding that "the exclusionary rule is not aborted whenever the government can show that illegally obtained evidence could have been lawfully obtained" because "[t]he rule is aimed more at the unlawful conduct than at the lawful availability or unavailability of the evidence"). Where a lawful search is underway prior to or concurrent with the allegedly illegal search, it is reasonable to conclude that the inculpatory evidence would inevitably have surfaced. See Id. But where officers have taken no steps to lawfully obtain the evidence – for example, by executing an affidavit for a search warrant or contacting a magistrate – the district court is not compelled to find that the officers would inevitably have done so. Id. ("[I]n McGarry the court believed that lawful efforts, begun prior to the illegal seizure, would inevitably have come up with the same documents . . . While the government argues that would have happened here also, the lower court was not compelled to agree with that proposition.") (citations omitted).

Following Almonte's arrest and before Pimentel signed the consent form, Dets. Fuoroli and Dempsey were aware of the following facts: that Almonte had been observed engaging in a "hand to hand" narcotics transaction with Wiggs; that Wiggs had given a formal

15

written statement explaining that he had just purchased drugs from Almonte; that Almonte had dropped a baggie full of drugs on the ground when officers approached; that Almonte had executed the drug transaction in front of his eleven-year-old stepdaughter; and that Pimentel denied the presence of narcotics or weapons in the home, but admitted that Almonte had a history of drug addiction and had recently been "drug sick." Notably, the alleged narcotics transaction took place around 3:00 p.m. on a school day and A.T. was in possession of her backpack when officers ordered her out of the car; these circumstances suggest that Almonte had likely picked up A.T. from school and was in the process of driving her home when they stopped at the McDonald's.

Taken together, the time of day, A.T.'s presence in the car with her backpack, and the fact that Pimentel, as Almonte's wife, admitted that Almonte had recently been "drug sick," all suggest that Almonte's alleged "drug dealing and home life were intertwined" in such a way that probable cause existed to search his home for evidence of drug possession and dealing. United States v. Ribeiro, 397 F.3d 43, 49-50 (1st Cir. 2005) ("[I]n going to the Charlie Horse's parking lot for the four controlled buys, Ribeiro left from his apartment three times and appeared to go directly to the rendezvous . . . Once, Ribeiro even brought his girlfriend and baby along for the ride from home, further

suggesting the extent to which his drug dealing and home life were intertwined.").

The Court also finds that, in the absence of Pimentel's consent, CPD officers would have actually applied for a search warrant. Defendant places great weight on the fact that none of the officers on the scene had started preparing to apply for a warrant, perhaps by preparing an affidavit for a search warrant or contacted a magistrate judge before they obtained Pimentel's consent to search the residence. He argues that this proves CPD officers would not have actually obtained a search warrant. See Def.'s Supp. Mem. 15-16. However, this argument ignores the fact that, during his conversation with Pimentel, Det. Fuoroli specifically informed her that, if she did not consent to the search, he would apply for a search warrant. Hr'g Tr. 124:10-15. It also ignores how quickly the sequence of events at the McDonald's unfolded, i.e., the fact that less than an hour elapsed between the time Almonte was arrested and the time that Pimentel signed the consent form. In this context, there was nothing improper about Det. Fuoroli attempting to secure convenient and prompt consensual access to Almonte's residence before taking any steps to apply for a search warrant. See United States v. Bey, 825 F.3d 75, 82 n.5 (1st Cir. 2016) ("[S]ensibly, there is no penalty in our Fourth Amendment framework for attempts by law enforcement to 'secur[e] convenient and prompt consensual access

[to premises] by conveying accurate information to a recipient.'") (quoting United States v. Vasquez, 724 F.3d 15, 22 (1st Cir. 2013). Had Pimentel refused consent, the Court finds that Det. Fuoroli, true to his word, would have applied for a search warrant and would have been successful in obtaining one; accordingly, the evidence seized from Defendant's residence is not subject to suppression.

IV. Conclusion

For the reasons stated herein, the Court DENIES Defendant's Motion to Suppress (ECF No. 18).


IT IS SO ORDERED.

/s/ W. Smith
_____
William E. Smith
Chief Judge
Date: March 29, 2019