UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

———————————————————————————————— )
                                  )
UNITED STATES OF AMERICA          )
                                  )
            v.                    )    Cr. No. 18-066 WES
                                  )
ARIEL ALMONTE,                    )
                                  )
            Defendant.            )
———————————————————————————————— )

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge

Before the Court is Ariel Almonte's Motion to Reconsider Defendant's Motion to Suppress Evidence and Reopen Hearing ("Mot. to Reconsider"), ECF No. 41. The Court held a hearing on this Motion on November 18, 2019, at which it heard testimony from Cranston Police Detective Ronald Fuoroli, as well as argument from counsel. After thorough consideration and for the reasons that follow, the Court GRANTS Defendant's Motion, finding that Williana Pimentel's consent to search the apartment she shared with Almonte was not voluntarily given, and that the independent discovery of the contraband from that home was not inevitable.

I.  Factual Background[1]

On February 28, 2018, while conducting surveillance in an unmarked vehicle at a local McDonald's, Detective Daniel Dempsey of the Cranston Police Department ("CPD") observed what he described as a "hand to hand transaction" -- he saw Almonte get out of his car in the parking lot, walk over to Richard Wiggs, who was inside another car, and "touch hands" briefly with Wiggs.  Jan. 17, 2019 Mot. to Suppress Hr'g Tr. 144:3-4; 146:22-147:1; 150:21-23; 153:16-18; 166:4-14; 183:14-22, ECF No. 27.  Det. Fuoroli arrived later as backup and testified that, as he approached to arrest Almonte, he saw Almonte drop a small bag of white powder on the ground.  Id. 72:1-20.  When questioned, Wiggs stated that Almonte had just sold him two $40.00 bags of heroin.[2]  Id. 24:7-17.

At the time of the alleged transaction, Almonte had his eleven-year-old step-daughter, A.T., in the car with him.  Id. 26:1-6.  After Fuoroli detained Almonte, A.T. was demonstrably

---

[1] The Court presumes familiarity with the detailed factual background set out in the Court's original Memorandum and Order on Defendant's Motion to Suppress, April 1, 2019, ECF No. 32. ("Mot. to Suppress Order").  Therefore, the Court will only briefly recite the facts, and will focus on those that are relevant to the determination of Defendant's Motion to Reconsider.

[2] Wiggs later told the police that it was "not true" that he bought drugs from Almonte that day.  Mot. to Suppress Hr'g Tr. 198: 5 – 199:12.

upset, and Fuoroli asked her some basic questions.  Id. 85:3-86:10.  He also ran the registration of Almonte's car and determined it was registered to an apartment at 355 Farmington Avenue.  Id. 27:6-19.  Fuoroli then called Williana Pimentel -- A.T.'s mother and Almonte's wife -- and at some point was able to reach her.  Id. 26:24-27:4; 86:22; 87:9-88:24.  When Pimentel arrived at the McDonald's parking lot, she asked another CPD officer twice whether she could leave with A.T. and was told "no" and that she "had to wait," although she was allowed to hold A.T.'s hand through the back window of the car.[3]  Id. 226:23-227:14; 228:14-19; Nov. 18, 2019 Mot. to Reconsider Hr'g Tr. 41:7-16; 66:23-24, ECF No. 50.[4]

Detective Fuoroli then made his first call to the Rhode Island Department of Children, Youth, and Families ("DCYF") hotline, during which he asked Pimentel questions about Almonte and relayed the answers to the hotline operator.  Ex. 2(A) to Gov't Mem. in Opp'n to Def's Mot. to Reconsider and Reopen ("Gov't Opp'n") at 4-

---

[3] It is unclear whether Pimentel was able to hold A.T's hand and comfort her before Fuoroli's call with DCYF or after.  Mot. to Suppress Hr'g Tr. 32:13-18; 98:1-8; 228:18-21; 229:1-19.

[4] The chronology of events is somewhat unclear, due to Det. Fuoroli's stated inability to recall exact details, and the contradictions between his testimony at the first hearing on the Motion to Suppress and the call recordings from DCYF that have since been received into evidence.  See Def's Mot. to Reconsider Mot. Supp. ECF No. 41; Ex. 2(A) to Gov't Mem. in Opp'n to Def.'s Mot. to Reconsider and Reopen, ECF No. 46-1; Mot. to Reconsider Hr'g Tr. 13: 15-17; 23:7-12.

5, ECF No. 46-1; Mot. to Reconsider Hr'g Tr. 18:24–19:2; 21:3–22:8.  During that same call, the hotline operator and Det. Fuoroli discussed what the next steps would be regarding A.T. Ex. 2(A) at 9-10.  The hotline operator said, "[a]s it stands right now, [A.T. is] probably going back to the mother because . . . she's not going to be arrested.  But if you find any drugs in that house . . . things might change." Id. Detective Fuoroli responded that if he did he would call the hotline back. Id. at 10.

After the call was over, Pimentel again asked if she could leave with A.T. and was told no.[5]  Mot. to Suppress Hr'g Tr. 229: 15-19; Mot. to Reconsider Hr'g Tr. 66:9-68:1.  Fuoroli then asked Pimentel if there were any weapons or narcotics at the home and she replied that "she didn't think so . . . [t]hat he used to have a drug problem and that he was recently sick."[6]  Mot. to Reconsider Hr'g Tr. 70:25-71:5.

During this same conversation, Fuoroli asked Pimentel for her consent to search the apartment she shared with Almonte on

---

[5] It is unclear if Pimentel asked Det. Fuoroli or a different police officer on the scene.  See Mot. to Suppress Hr'g Tr. 229: 15-19; Mot. to Reconsider Hr'g Tr. 66:9-68:1.

[6] According to Fuoroli, Pimentel relayed the information about Almonte's drug problem before she gave her consent to search the apartment she shared with Almonte.  Mot. to Reconsider Hr'g Tr. 70:25-71:12.  Pimentel's testimony was she did not tell Fuoroli that information until after she had signed the consent form.  Mot. to Suppress Hr'g Tr. 254: 10-17.

Farmington Avenue, and she did not initially consent. Mot. to Suppress Hr'g Tr. 106: 8-21; 230:13-17. Detective Fuoroli testified that he told Pimentel that he wanted to search the apartment to make sure there was nothing harmful in the home for her child. Id. 107:4-6. He said he also told Pimentel that DCYF had been called and that DCYF "was not going to allow her to take that child back to her home until it had been searched and made safe or made secure."[7] Mot. to Reconsider Hr'g Tr. 29:22 – 30:5; Mot. to Suppress Hr'g Tr. 136:4-10. Pimentel testified that Fuoroli told her that if she didn't sign "they were going to take my daughter away," and that he did not mention DCYF. Mot. to Suppress Hr'g Tr. 232:18-21; 238:17-18; 255:13-14

Pimentel asked Fuoroli what would happen if she did not sign the form, and he replied that "more than likely we would have to secure the apartment and we may apply for a search warrant." Id. 42:12-13. Pimentel eventually verbally consented to the search and signed the form. Id. 39:3-12; 43:3-4. After she did so, Pimentel was allowed to leave with A.T. and the officers followed

---

[7] The recording of the call, which was obtained after the first hearing and admitted into evidence during the Motion for Reconsideration hearing, does not reflect this. See Ex. 2(A). At the hearing on Defendant's Motion to Reconsider, Fuoroli testified that he could only explain the inconsistencies between his original testimony and the call recordings as "memory lapse[s]." Mot. to Reconsider Hr'g Tr. 9:24-25; 11:7-11.

them to their residence to execute the search of the apartment.[8]
Id. 113:12-20.

During the search of Almonte's residence, CPD officers seized
heroin, fentanyl, marijuana, various drug paraphernalia, a
firearm, and $942.00 in cash, all of which was used to charge
Almonte with possession with intent to distribute fentanyl and
possession of a firearm in furtherance of drug trafficking.  Gov't
Mem. in Supp. of Obj. to Def's Mot. to Suppress ("Gov't Mem.") 6-
7, ECF No. 20-1; see Indictment, ECF No. 9; see also Criminal
Compl., ECF No. 1.  In the middle of the search, Fuoroli called
the DCYF hotline and informed the operator of the drugs that had
been found, and the operator said he would "write it up."  Ex.
2(B) to Gov't Opp'n 3,5, ECF No. 46-2.  After the firearm was
found, the DCYF operator called Fuoroli back, Fuoroli informed him
of the discovery of the firearm, and the operator told him that
DCYF was sending somebody to the house.[9]  Ex. 2(C) to Gov't Opp'n
4, ECF No. 46-3.  Eventually, a DCYF representative arrived and
removed A.T.  Mot. to Suppress Hr'g Tr. 237:5-25.

---

[8] Fuoroli originally testified that he called DCYF again
before leaving the scene, but there is no record of any such call.
See Mot. to Suppress Hr'g Tr. 106:1-3; see generally Exs. 2(A),
2(B), 2(C) to Gov't Opp'n.

[9] Det. Fuoroli initially testified that he spoke to a
different DCYF operator before leaving the house and she told him
to release A.T. to her mother.  Mot. to Suppress Hr'g Tr. 138:16-
18.  There is no record of any such call.

II.  Standard of Review

A motion to reconsider should be granted "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust."  United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009).  Additionally, the Court has discretion to reconsider its own ruling.  Pickett v. Prince, 207 F.3d 402, 407 (7th Cir. 2000) ("[A] motion to reconsider a ruling is constrained only by the doctrine of the law of the case. And that doctrine is highly flexible, especially when a judge is being asked to reconsider his own ruling.") (emphasis omitted).  Here, for the reasons explained herein, there are good grounds to reconsider.

III. Discussion

A.    Whether Pimentel's Consent Was Voluntary

Consent is an exception to the Fourth Amendment's prohibition on government searches of a person's residence without a warrant. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).  Consent may be obtained from an occupant or "a third party who possesses common authority over the premises."  Id.  It is undisputed that Pimentel, as Almonte's wife and a cohabiter of the apartment, had authority to consent to a search of the residence; the question is whether she was coerced into providing that consent, such that it was not voluntarily given.

The government bears the burden of proving by a preponderance of the evidence that consent to search was voluntarily given. Lego v. Twomey, 404 U.S. 477, 489 (1972). Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker"; it cannot be the result of coercion, either express or implied. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). In assessing voluntariness, courts examine the following factors, although none of them are dispositive: "(i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics." United States v. Perez-Diaz, 848 F.3d 33, 39 (1st Cir. 2017) (quoting United States v. Vanvliet, 542 F.3d 259, 264 n.2 (1st Cir. 2008)).

Courts have long recognized that the "psychological coercion generated by concern for a loved one" can affect a person's "capacity for self control." United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) (internal citation omitted). The "mere fact that a defendant is placed under some psychological pressure by agents does not necessarily render a confession involuntary." United States v. Jacques, 744 F.3d 804, 811 (1st Cir. 2014) (quotation marks and internal citations omitted). However, "[w]hen law enforcement officers deliberately prey upon the

maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert . . . 'improper influence.'" <u>Tingle</u>, 658 F.2d at 1336 (quoting <u>Molloy v. Hogan</u>, 378 U.S. 1, 7 (1964)); <u>see also</u> <u>United States v. Tibbs</u>, 49 F. Supp.2d 47, 53 (D. Mass. 1999) (finding it "more likely than not that the police said to [defendant's girlfriend] perhaps the one thing guaranteed to secure her consent, that her child would be taken away if she did not consent . . . . Once they threatened her child, there was no question that she would succumb – hardly voluntarily."). The question here then is whether what Fuoroli said to Pimentel was enough to cross the line from "some psychological pressure" to "improper influence."

In its Memorandum and Order denying Almonte's Motion to Suppress, this Court unequivocally credited Det. Fuoroli's testimony that he told Pimentel that DCYF would not let her back into the apartment until they were satisfied there was nothing harmful for the child there. Apr. 1, 2019 Mem. and Order 11, ECF No. 32 ("Mot. to Suppress Order") ("[B]ased on all the other facts and circumstances in which this threat was allegedly made, the Court does not find [Pimentel's] testimony credible; instead, it credits Det. Fuoroli's version of events."). In light of the call recordings with DCYF and Det. Fuoroli's testimony at the recent hearing, the Court is no longer confident that Det. Fuoroli's

initial testimony as to what he told Pimentel is accurate.[10] However, the Court also does not find Pimentel's version of events -- that Fuoroli said he would take her child away if she didn't sign -- entirely credible either. Mot. to Suppress Hr'g Tr. 230:13-20.

But the Court does know, from the call recordings, that even if Fuoroli's testimony was accurate, he was not merely repeating what DCYF told him on the phone.[11] In fact, he made a subtle but significant change: DCYF informed him that "[a]s it stands right now, [A.T. is] probably going to [sic] back to the mother," but Fuoroli told Pimentel that DCYF "was not going to allow her to take that child back to her home until it had been searched and made safe or made secure." Ex. 2(A) at 9-10; Mot. to Reconsider Hr'g Tr. 29:22 – 30:5. Det. Fuoroli changed A.T.'s default status from going back to her mother <u>unless</u> something harmful was found in the house to <u>not</u> going back to Pimentel <u>until</u> the house was

---

[10] To be absolutely clear – the Court does not think that Det. Fuoroli deliberately lied – rather it is now clear that he was unable to accurately remember and recount the conversations he had with Pimentel and DCYF.

[11] The accuracy of Fuoroli's comments to Pimentel were a significant factor in the Court's original ruling. Mot. to Suppress Order 11("When Pimentel asked him directly if they were going to take A.T. away, Det. Fuoroli <u>truthfully</u> responded . . .")(emphasis added); <u>id.</u> at 12 ("Here, Det. Fuoroli did not use the specter of removing A.T. to 'prey' on Pimentel's maternal instinct; rather, he conveyed <u>accurate</u> information based on what he knew from DCYF at the time.") (emphasis added).

cleared. This shift by Fuoroli makes the tactic more coercive than if he had merely parroted what DCYF had told him. See Janusiak v. Cooper, 937 F.3d 880, 891-92 (7th Cir. 2019) (holding that the police can speak truthfully about the likely consequences for children when a parent is arrested but "any statements about a child's custody should not be false; otherwise the suspect's will may be overborne . . . ."); United States v. Ivy, 165 F.3d 397, 403 (6th Cir. 1998) (finding that the "unequivocal[]" statement made by the police that if defendant did not consent to the search, his child would go into state custody, was not accurate and therefore was "not merely trying to provide [defendant] with data upon which to base his decision to consent, but rather was attempting to overcome [his] resolution not to consent.") (emphasis in original). This is especially so when the Court considers the possibility, as discussed above, that Fuoroli's actual words to Pimentel may have veered closer to a threat than what he admitted or recalled.[12]

Pimentel's subjective understanding, provided it was reasonable, is another factor in determining whether her consent was voluntary. See Tingle, 658 F.2d at 1336 ("We think it clear that the purpose and objective of the interrogation was to cause

---

[12] None of this is to suggest that in the event DCYF had said it wanted the home searched, law enforcement would be permitted to use this with impunity. This issue is not before the Court.

[the defendant] to fear that, if she failed to cooperate, she would not see her young child for a long time . . . such would be the conclusion which [the defendant] could reasonably be expected to draw from the agent's use of this technique"); United States v. Harvey, No. 3:07-CR-00103-RRB-DMS, 2008 WL 11395588, at *9 (D. Alaska Apr. 1, 2008) ("The court has to look at the subjective state of the person who consents and must look at the reasonableness of their fear."). Pimentel's stated understanding was that the police were going to take her child away if she did not sign the consent form, and that she had to sign the form in order to leave with A.T. Mot. to Suppress Hr'g Tr. 230:13-231:4; 232:12-25; 238:13-24. This subjective belief was not unreasonable where Pimentel had already asked multiple times if she could leave with her child and was refused, and where there is no evidence that she had prior experience with the police or the criminal justice system. Mot. to Suppress Hr'g Tr. 112:24-113:2; 226:23-227:14; see United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) (noting that defendants who lack familiarity with the criminal justice system may be particularly "susceptible to psychological coercion").

In considering whether Pimentel's consent was involuntary, United States v. Bey, 52 F. Supp. 3d 299 (D. Mass. 2014), aff'd, 825 F.3d 75 (1st Cir. 2016), is instructive. In that case, while the police were executing a warrant for defendant's arrest at the

12

home of Clarissa Summons, they attempted to obtain her consent to search the home. Bey, 52. F. Supp.3d at 301, 305. Summons's son also lived there, and was present at the time of the arrest. Id. The officer who first spoke with Summons mentioned contacting child protective services, but did not refer directly to the possibility of removing her son from the home; following that conversation, another officer brought over a "consent to search" form and asked her permission to search the premises. Id. at 301. Summons was told that she was free to withhold consent, but that if she did, she and her son would have to leave for several hours while police secured the home and obtained a warrant. Id. at 301-02. She signed the consent form. Id. at 302.

The District Court found Summons' consent was voluntarily given. Id. at 305. The Court explained that the officer never referenced the possibility that Summons's son could be removed from the home or "linked the consent to search with any threats or promises relating to" child protective services and, on the contrary, the officer "sat down with Summons and carefully described the terms of the consent form to her . . . she did not manifest any noticeable angst, apprehension, or anxiety when she signed the form." Id.

That scenario is markedly different from what occurred here. Here, even taking Fuoroli's testimony at face value, he did reference the possibility that A.T. could be removed from

Pimentel's custody, and explicitly linked that possibility to Pimentel's consent to search. Mot. to Reconsider Hr'g Tr. 29:22-30:5; Mot. to Suppress Hr'g Tr. 136:4-10. While Fuoroli testified that he read the search form to Pimentel, it must have been done very briefly, since he also testified Pimentel was only at the scene for a total of ten minutes. Mot. to Suppress Hr'g Tr. 42:3-4; 44:17-20. And Pimentel, unlike Summons, did show signs of angst and anxiety when she refused consent at first and "huffed and puffed and gave [Fuoroli] a stare." Id. 106:20-23.

Therefore, in evaluating the case law and applying it to the totality of the circumstances here, particularly the Court's new understanding that Det. Fuoroli's statements to Pimentel were at odds with what DCYF actually told him, the Court finds that Pimentel's will was overborne by Fuoroli's coercive tactics and thus her consent to search was not voluntarily given.[13]

B.    Inevitable Discovery

In the Order granting the Motion to Suppress, this Court found that, even without Pimentel's consent, the contraband recovered from Almonte's residence would inevitably have been discovered

---

[13] The Court does not disturb its previous ruling that Pimentel's temporary detention was a reasonable exercise of the CPD officers' "community caretaking function." See United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006) (aiding those in distress, combatting actual hazards and preventing potential hazards from materializing are some of the community caretaking functions); see also Mot. to Suppress Order 10 n.2.

when the police applied for and were granted a search warrant. Mot. to Suppress Order 13. The Court also reverses its ruling on this point, finding that its previous ruling was an error of law. See Allen, 573 F.3d at 53.

The inevitable discovery doctrine provides:

> Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, so as long as (i) the lawful means of its discovery are independent and would necessarily have been employed; (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

United States v. Lee, Cr. No. 17-120 WES, 2018 WL 3873668, at *8 (D.R.I. Aug. 15, 2018) (quoting United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994)). The parties agree that if Pimentel had not consented (or because her consent was involuntary) the only alternative "lawful means" available to CPD officers in this case was to obtain a search warrant for Almonte's home.

A search warrant application must reveal probable cause to believe two things: (1) "that a crime has occurred" and (2) "that specified evidence of the crime will be at the search location." United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016); see U.S. Const. amend. IV. When establishing that specified evidence of a crime will be at the search location, the magistrate must "make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Although "a law enforcement officer's training and experience may yield insights that support a probable cause determination," the First Circuit has held that police must provide additional "specific facts connecting the drug dealing to the home" to establish probable cause for searching the defendant's residence. United States v. Bain, 874 F.3d 1, 23-24 (1st Cir. 2017) (quotation marks and internal citation omitted). Additionally, regardless of whether probable cause existed at the time, the Court must determine whether or not CPD officers would have actually sought a search warrant for the residence.[14] United States v. Finucan, 708 F.2d 838, 843 (1st Cir. 1983).

This Court based its original ruling on the following facts that it found Detectives Fuoroli and Dempsey were aware of after Almonte's arrest and before Pimentel signed the consent form:

> that Almonte had been observed engaging in a "hand to hand" narcotics transaction with Wiggs; that Wiggs had given a formal written statement explaining that he had just purchased drugs from Almonte; that Almonte had dropped a baggie full of drugs on the ground

---

[14] The Court does not need to decide this where it is ruling that, even if CPD officers had tried to obtain a warrant, they would not have been successful due to lack of probable cause.

> when officers approached; that Almonte had
> executed the drug transaction in front of his
> eleven-year-old stepdaughter; and that
> Pimentel denied the presence of narcotics or
> weapons in the home, but admitted that Almonte
> had a history of drug addiction and had
> recently been "drug sick."

Mot. to Suppress Order 15-16.

Courts have held that, in order to obtain a search warrant for a residence, to support the inference that there will be drugs or other contraband in the home, some additional evidence is required to establish a nexus between the drug dealing and the home beyond "general information from police officers that drug dealers tend to store evidence in their homes." Bain, 874 F.3d at 23-24; see also Rivera, 825 F.3d at 66 ("We might very well have reached a different result had a commonsense reading of the evidence not indicated that [the defendant] participated in a drug-related phone call from his home. But with that inference, there is enough probable cause to believe evidence of his drug-pushing activities would be at his house."); United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) ("Here, given both that the CI stated that [the defendant] lived at the . . . residence and that the police observed [the defendant] exit the . . . residence, drive away, and sell drugs on the day of his arrest and the search, the totality of the circumstances strongly suggested that there was evidence of drug dealing at the . . . residence."); United States v. Ribeiro, 397 F.3d 43, 52 (1st Cir. 2005) (finding nexus

established from drug dealing to residence where the police were "virtually certain" defendant left his house carrying the drugs he was about to sell); United States v. Brandao, 270 F. Supp.3d 485, 490 (D. Mass. 2017) (finding enough nexus to residence for probable cause where police observed that on three of the four controlled buys, the defendant left the residence shortly after making contact with the undercover detective and went directly to the location of the drug transaction).

In one of the most recent cases on the subject, United States v. Roman, 942 F.3d 43(1st Cir. 2019), the First Circuit explained that, while a "nexus" between evidence sought and the place to be searched "need not, and often will not, rest on direct observation, but rather can be inferred . . . we have not permitted this inference to be applied lightly." Roman, 942 F.3d at 51 (quoting Feliz, 182 F.3d at 88). The First Circuit was explicit: "[w]e have rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity." Id. Specifically, the Court noted that "generalized observations" such as general information from police officers regarding where drug dealers store drugs "should be 'combined with specific observations' or facts 'connecting the drug dealing to the home' to permit an inference of nexus to a defendant's residence." Id. at 52 (quoting Ribeiro, 397 F.3d at 50-51; Bain, 874 F.3d at 24).

The First Circuit then found that police had not shown the required "nexus" where the warrant affidavit "contain[ed] no specific facts or observations connecting [defendant's] alleged drug activity to his home . . . it fail[ed] to even on one occasion place [the defendant] himself at the residence, let alone in connection with drug crimes." Id. Accordingly, that Court found there was no probable cause to search defendant's residence and the fruits of the search had been properly suppressed. Id. at 55.

None of the facts of the variety described by the First Circuit as establishing the required nexus between drug selling and a residence are present here. All the police observed was an alleged drug transaction in a McDonald's parking lot. The police did not witness Almonte going to or from his house before or after the alleged drug transaction took place, nor did any confidential informant or other source see such activity. The police never witnessed Almonte making any possible drug-related phone calls from his house. The police did not possess any evidence connecting Almonte's drug-dealing to his residence at all at the time they would have sought a search warrant.[15]

_____

[15] In United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999), one of the few cases where the First Circuit held that it could be reasonably inferred that a defendant kept information related to his drug transactions in his house, even without direct observation, the police had reliable detailed information that the defendant had a 12-year career in drug trafficking. Just as the First Circuit distinguished Feliz in Roman, in the instant case the facts are also a "far cry" from the facts in Feliz. Roman, 942

Pimentel's description of Almonte as "drug sick" does not establish a sufficient nexus between his drug selling and his residence.[16]  Almonte's alleged drug usage, and whatever sickness it caused him, is entirely irrelevant to what would have been the basis of the search warrant – Almonte's alleged sale of drugs to Wiggs and the possibility of contraband related to that sale being in his residence.

In fact, the only evidence remaining to connect Almonte's alleged drug transaction to his residence is the fact that he had his stepdaughter A.T. with him at the time, and that he may have picked her up from school on the way home (based on the presence of her backpack).  Mot. to Suppress Hr'g Tr. 200:7.  The Court, in its thorough review of the cases on this subject, could not find a single case in this jurisdiction that allowed the search of a home based on such thin evidence of a nexus between the drug transaction and the residence.  The Court simply cannot rule, based on this evidence alone, that police could have shown a sufficient

_____

F.3d at 52 (citing United States v. Roman, 327 F. Supp.3d 312, 326 (D. Mass. 2018)).

[16] Notably, it is not clear that Pimentel ever actually used the phrase "drug sick" to describe Almonte.  Fuoroli testified that she stated that "her husband used to have a drug problem in the past and that he had recently been sick," and her testimony does not contradict that.  Mot. to Suppress Hr'g Tr. 38:4-12; 254:10-17.  Additionally, it is possible that Pimentel did not even tell Fuoroli about Almonte being sick until after she signed the consent form.  Id. 254:10-17.

nexus between Almonte's alleged drug transaction and his residence that would have enabled them to show probable cause for a search warrant, especially in light of the high standard evinced by the First Circuit.  See Roman, 942 F.3d at 51-52.  Therefore, the evidence recovered from Almonte's residence is suppressed.

IV. Conclusion

For the reasons stated herein, the Court GRANTS Defendant's Motion to Reconsider Defendant's Motion to Suppress Evidence, ECF 41.

IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date: January 22, 2020