```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
         v.                        )   Cr. No. 18-066 WES
                                   )
ARIEL ALMONTE,                     )
                                   )
         Defendant.                )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

Before the Court is the Government's Motion to Reconsider to (1) Correct the Errors in the Order Granting Suppression Motion and (2) to Reconsider the Ruling Granting Suppression ("Gov't Mot. Reconsider"), ECF No. 56. For the reasons that follow, the Government's Motion to Reconsider its ruling is DENIED; however, the Government has made several points with which the Court agrees and therefore, in conjunction with this Order, the Court has issued an Amended Memorandum and Order ("Amended Order"), ECF No. 64, in order to correct and clarify the factual record in certain respects.

I. The Government's Factual Contentions[1]

A. The Fourth DCYF Call

---

[1] For a full procedural and factual background, see the Amended Order "Findings of Fact" section.

1

The Government points out that footnote 9 of the Court's January 2020 Order is not accurate. Gov't Mot. Reconsider 2 (citing January 22, 2020 Mem. and Order 6 n.9 ("Jan. 2020 Order"), ECF No. 51). That footnote states that "Det. Fuoroli initially testified that he spoke to a different DCYF operator before leaving the house and she told him to release A.T. to her mother . . . . There is no record of any such call." Jan. 2020 Order (citation omitted). The Government is correct that there is, in fact, a record of this call. At the November 18, 2019 hearing, Det. Fuoroli testified as follows:

> Q: In response to being told that there were three calls that were located, did you say anything about a fourth recording with a female?
>
> . . .
>
> [Det. Fuoroli]: Yes.
>
> Q: What did you say?
>
> [Det. Fuoroli]: I said that there was a fourth call that I made prior to leaving to the house to make sure that somebody was coming. I got a different female who didn't seem too familiar with the situation and we had a conversation.

Nov. 18, 2019 Hr'g Tr. 58:8-19, ECF No. 50. The Government then played a recording of that call during the hearing, and a transcript was admitted into evidence. Id. at 59:1-8; Gov't Ex.

2

1D, Nov. 18, 2019 Hr'g.[2]  The transcript and recording of the call corroborate Det. Fuoroli's testimony that he had a fourth call with DCYF.  The Government also admitted Det. Fuoroli's cell phone records, which confirm that he made a fourth call to DCYF.  Id. at 59:12-60:4; Gov't Mem. in Opp'n to Def.'s Mot. to Reconsider and Reopen ("Gov't Opp'n"), ECF No. 46-4, Ex. 3.

The correction of this factual error, however, does not change the Court's view of Det. Fuoroli's credibility.  While the Court acknowledges its error in the footnote, and has corrected it in the Amended Order, the fact remains that Det. Fuoroli did not accurately recall in his testimony the events that occurred on February 28, 2018, as reflected in the recordings.  See Amended Order 4-6, 12-13.  Most importantly, as outlined below in Section I.E., Det. Fuoroli's recall of his fourth conversation with DCYF has no impact on the Court's assessment of his credibility on the central issue of what DCYF said to him regarding Pimentel's daughter.  See infra p.10.

B. Wiggs' Statements

The Government makes much of the Court's use of the word

---

[2] The transcript of this call was admitted as "Government Exhibit 1D" at the November 18, 2019 hearing after the audio recording was played.  Nov. 18, 2019 Hr'g Tr. 47:15-48:5.  The transcript of this fourth call was not attached as an exhibit to the Government's Memorandum in Opposition to Defendant's Motion to Reconsider and Reopen, ECF No. 46, like the other three call transcripts were.

"just" in the statement that "[w]hen questioned, Wiggs stated that Almonte had just sold him two $40.00 bags of heroin." Jan. 2020 Order 2 (citing Jan. 17, 2019 Mot. to Suppress Hr'g Tr. 24:7-17). The Government argues that the temporal element implied in this sentence is inaccurate because Det. Fuoroli did not use the word "just" in his testimony relaying Wiggs' statement. Gov't Mot. Reconsider 6. But the record is clear that the police thought that Wiggs' statement was referring to the transaction the police had observed minutes earlier between Wiggs and Almonte in the McDonald's parking lot:

> Q: But on scene that day, the knowledge that you had from Mr. Wiggs was that the drugs had gone from Mr. Almonte to Mr. Wiggs in that parking lot.
>
> [Det. Fuoroli]: Correct.
>
> Jan. 17, 2019 Hr'g Tr. 127:16-19.
>
> ***
>
> Q: And what did he tell you? Why was [Wiggs] there?
>
> [Det. Dempsey]: He said that he had purchased two $40 bags of heroin from a gentleman he identified as Socio and had pulled into the parking lot to use before we interrupted him.
>
> Id. at 156:15-19.
>
> ***
>
> Q: So Mr. Wiggs, though, he did give you a written statement at the scene; correct?
>
> [Det. Dempsey]: Yes ma'am.

4

> Q: And in addition to telling you that he had met at McDonald's to buy two $40 bags of Fentanyl, he also said he knew Mr. Almonte by the name Socio; correct?
>
> [Det. Dempsey]: Socio, yes, ma'am.
>
> Id. at 194:15-21.

The only logical reading of Wiggs' statements, based on what the police knew at the time, was that the drug sale had happened shortly before the encounter in the McDonald's parking lot. Thus, the introduction of the temporal element conveyed by the word "just" came from Dets. Fuoroli and Dempsey, and from Wiggs, not from the Court. The Court's description simply reflects what the officers testified to about what they thought they knew at the time.

Presumably, the reason the Government makes this argument is because of what the police learned three months later when they re-interviewed Wiggs. The police brought Wiggs back in to give a more "accurate" statement. Id. at 123:14-25. Wiggs told the police in his later statement that he had not, in fact, bought drugs from Almonte in the parking lot of McDonald's that day, but rather had purchased drugs from Almonte in downtown Cranston earlier that day, and at the McDonald's he was merely returning a bag to Almonte that Almonte had dropped in Wiggs' car by accident. Id. at 123:14-25; 125:10-127:4; 198:16-199:13.

5

This brings us to the Court's footnote stating that "Wiggs later told the police that it was 'not true' that he bought drugs from Almonte that day." Jan. 2020 Order 2 n.2 (citing Jan. 17, 2019 Hr'g Tr. 198:5-199:13). While the Court does not agree that this statement is inaccurate, in the Amended Order that footnote has now been expanded to provide the additional context outlined in the above paragraph. Amended Order 2 n.2.

Regardless, these arguments by the Government are just red herrings. As the Government acknowledges, what Wiggs said to the police three months later is irrelevant to the inevitable discovery analysis. See Gov't Mot. Reconsider 12. What matters is what the police observed and believed occurred on the day in question – which was that Almonte had sold drugs, or had been in the process of selling drugs, to Wiggs – because that is what the police would have included in a search warrant, had they applied for one. Jan. 17, 2019 Hr'g Tr. 132:24-133:7.

C. Pimentel's Statements Regarding Drugs/Firearms

The Government takes issue with the Court's statement that "Pimentel denied the presence of narcotics or weapons in the home . . . ." Gov't Mot. Reconsider 13 (citing Jan. 2020 Order 17). The Court notes that this statement was actually in a block quote from the Court's April 2019 Order -- the Court was listing the facts that had informed the Court's original decision on this matter, before Almonte filed his Motion to Reconsider, which the

6

Court granted.  Jan. 2020 Order 16-17 (quoting April 1, 2019 Mem. and Order 15-16, ECF No. 32).  The relevant statements Pimentel made about the presence of drugs and firearms in the home she shared with Almonte were accurately set out in the revised "Factual Background" section of the January 2020 Order, and these are the facts the Court has considered in its analysis.  See Jan. 2020 Order 4.  However, in the interest of clarity, the Court has added all of the statements Pimentel made on the subject into the "Findings of Fact" section of the Amended Order.  Amended Order 5 & n.9.

Additionally, the Court finds the Government's argument -- that "lack of knowledge is not the same thing as an affirmative denial that a fact exists" -- to be a distinction without a meaningful difference as it relates to the inevitable discovery analysis.  Gov't Mot. Reconsider 13.  Whether Pimentel was definitive or not about the lack of contraband in the home does not make it more likely that the police would have obtained a warrant; in fact, Pimentel's lack of assurance on the subject actually makes her more credible in the Court's eyes: an unequivocal denial under the circumstances could easily be seen as an attempt to cover for her husband.

    D. Information Known to Police Prior to Pimentel Signing Consent Form

The Government alleges that the Court omitted numerous facts from its Opinion that it should have considered on the issues of

7

probable cause and inevitable discovery. See Gov't Mot. Reconsider 13-15.  As an initial matter, many of these facts the Government claims are missing were actually in the Court's Order[3]: namely, that Almonte brought his step-daughter with him; the police obtained Almonte's address from his vehicle registration; that Pimentel shared an apartment with Almonte and her daughter; and Almonte dropped a bag of drugs to the ground.  Jan. 2020 Order 2-5. Next, some of the facts the Government cites are simply not relevant – for example, Almonte's nervousness as he approached Wiggs' vehicle is not probative of anything, where the Court has already credited Det. Dempsey's testimony that he saw what he believed to be a hand to hand drug transaction taking place.  Id. at 2, 19; Amended Order 2-3.

That being said, the Court has added several facts noted by the Government to the Court's Amended Order, including Wiggs' description of Almonte as a drug dealer, Almonte's possession of several phones, Almonte's lack of employment, and Det. Fuoroli's extensive experience as a narcotics investigator.[4] Amended Order 2-8, 19-20, 22-23.

---

[3] The Government's error here appears to result from its focus on the block quote on p.17 of the Jan. 2020 Order, rather than on the factual background section of that Order.

[4] Some of these facts have been added in the "Findings of Fact" section, some in the independent discovery analysis, and some in both, where appropriate.

On this last point, the Government says: "[a]t the [f]irst hearing, Detective Fuoroli testified that CPD would have sought a search warrant if Ms. Pimentel had not given consent." Gov't Mot. Reconsider 15. The Government then quotes the transcript from that Jan. 17, 2019 hearing, wherein Det. Fuoroli states that had he prepared a search warrant, he "[a]bsolutely" would have included "information . . . about [his] prior experiences and knowledge." Id. (citing Jan. 17, 2019 Hr'g Tr. 129:8-130:13. This section of the transcript does not support the Government's contention, right before the quote, that the detectives definitively would have sought a search warrant. Clearly, "if" is not the same as "would have." But regardless, in its Amended Order the Court clarifies its finding that, if Pimentel had not consented to the search, the Detectives would have applied for a search warrant, and that warrant would have included Det. Fuoroli's observations based on his experience. Amended Order 20; see Jan. 17, 2019 Hr'g Tr. at 6:17-7:14; 130:2-13. While the Court agrees that these additional facts should be added, none of them tips the inevitable discovery analysis back in the Government's favor, as explained below.

E. Detective Fuoroli's Credibility

In its Motion to Reconsider, the Government spends several pages arguing that the correction of the factual errors it has noted should change the Court's assessment of Det. Fuoroli's credibility, and therefore change the outcome. Gov't Mot.

9

Reconsider 16-18. The Court disagrees. The fact that Det. Fuoroli testified accurately about the fact that he had a fourth call with DCYF does not affect the Court's findings about the inaccuracies and inconsistences in his testimony regarding what DCYF told him during the first call. See supra p.3; Amended Order 6, 11-13. And it is that discrepancy that was, and remains, at the heart of the Court's decision regarding Pimentel's consent.

The Court is absolutely confident in its assessment that Det. Fuoroli did not accurately testify as to what DCYF told him, and what he told Pimentel, about whether DCYF would allow her child to return to her home. See Amended Order 6, 12-13. To this effect, the Amended Order reflects additional testimony from the January 17, 2019 hearing in which Det. Fuoroli asserted that he "definitely" remembered the DCYF operator telling him that they would not let the child back into the home until it had been searched. Jan. 17, 2019 Hr'g Tr. 140:13–141:4; Amended Order 12 n.13. That memory, while confident, is inaccurate.

Finally, the Government argues that Det. Fuoroli was acting "out of interest for the child" and that he showed a "calm and professional" demeanor. Gov't Mot. Reconsider 16-18. This may be true, but the Court never suggested otherwise, and does not find either of those facts to be relevant to determining whether Pimentel's consent to search was voluntarily given.

    F.  Inevitable Discovery

10

The final argument the Government makes is that there is enough evidence of a "nexus" between Almonte's participation in the drug transaction and Almonte's residence that would support a finding of probable cause to search his residence. Gov't Mot. Reconsider 18-20.  First, the Government contends the Court did not give adequate consideration to several facts it claims weigh in favor of finding such a nexus; in its Amended Order, as described above, the Court has added additional discussion of some of these facts, but does not find that they change the outcome. See supra p.8-9.

The Government also attempts to distinguish United States v. Roman, 942 F.3d 43 (1st Cir. 2019), from this case. Gov't Mot. Reconsider 19.  As the Court acknowledged during argument, the question of whether the police had probable cause to get a warrant for Almonte's residence is a close call.  But, even considering the additional information regarding Almonte's history of drug dealing to Wiggs, his possession of multiple phones, and his lack of employment, the Court still finds that the police lacked the kind of "specific observations or facts connecting the drug dealing to the home" that Roman requires.  Id. at 52 (internal quotations omitted).

These facts shore up the notion that Almonte was a drug dealer for sure.  But the police had those facts already – they stumbled right into the drug deal and had Wiggs' statement.  So these

11

additional facts add little to the facts the police could rely on in a warrant application.

Nor is the Court persuaded by the Government's focus on Almonte's lack of employment; while in <u>Roman</u> the First Circuit did mention that its conclusion was "further bolstered" by the fact that the defendant had other places to hide contraband, the ruling was not predicated on that fact. <u>Id.</u> at 53.

The Court is also not persuaded by the Government's cite to <u>United States v. Ribeiro</u>, 397 F.3d 43 (1st Cir. 2005). It is true that Ribeiro once brought his girlfriend and baby in his car to a narcotics transaction, but in that case the police had also observed Ribeiro leaving his apartment three times to go to narcotics transactions, and he was tailed by the police all three times.[5] <u>Id.</u> at 50. In <u>Ribeiro</u>, the warrant affidavit included a detective's opinion, based on his training and experience, that drug traffickers often store cash and records (which is what the warrant application sought) at their residences. <u>Id.</u> at 46. The First Circuit explained that "<u>when combined with specific observations about Ribeiro's movements back and forth from his residence in relation to drug transactions</u>, these general observations <u>contribute significantly</u> to the probable-cause

---

[5] One time the police tailed Ribeiro the whole way, and the other two times he was out of their sight for less than ten minutes "which suggests that he was not stopping along the way." <u>Ribeiro</u>, 397 F.3d at 50.

determination." Id. at 51 (emphasis added).  Here, where there were no direct observations of Almonte coming or going from his home in relation to his drug dealing, Det. Fuoroli's generalized opinions are not enough to provide probable cause for a search of Almonte's residence.  See Amended Order 19-24.

The Government makes a new and novel argument in its motion, essentially asking this Court, a federal court, to ignore the line of First Circuit cases interpreting the Fourth Amendment probable cause requirement, in favor of several Rhode Island Supreme Court decisions, which it says would have guided the state judge in determining whether there was probable cause.  See Gov't Mot. Reconsider 20-22.

For starters, the cases the Government cites are clearly distinguishable.  State v. Byrne, 972 A.2d 633, 641 (R.I. 2009), is a video voyeurism case in which the court's ruling hinges largely on its observation that evidence of video voyeurism, like "images of child pornography[,] are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases." (quoting United States v. Riccardi, 405 F.3d 852, 861 (10th Cir. 2005). And in State v. Cosme, 57 A.3d 295, 302 (R.I. 2012), the warrant "affidavit explicitly state[d]" that the confidential informant reported that a black male distributed cocaine from what turned out to be the defendant's address.  There also appears to be a measure of

13

deference given by the Rhode Island Supreme Court in cases where it is reviewing a warrant that has already been obtained, which is not the situation here. See id.(stating that, in making a probable cause determination, "[t]he magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit, and in doubtful cases, the reviewing court should give preference to the validity of the warrant.") (citations and quotations omitted).

More importantly, the Government's argument is fatally flawed as a matter of constitutional law. In effect, the Government is saying that even if the Fourth Amendment (as interpreted by the First Circuit in Roman and Ribeiro) would prohibit a warrantless search of a defendant's residence, and where the facts do not establish probable cause, the inevitable discovery doctrine nonetheless must forgive the violation because the Rhode Island Supreme Court takes a looser, more law-enforcement-friendly position regarding what constitutes probable cause. This is incorrect: while a state supreme court may certainly take a broader view of a constitutional protection (such as the Fourth Amendment's protection against unlawful searches and seizures) in interpreting the state constitution's analog[6], it is not free to take a narrower

---

[6] A state supreme court also may not take a broader view of a federal constitutional protection than that afforded by the United States Supreme Court. Arkansas v. Sullivan, 532 U.S. 769, 772 (2001) (reversing state supreme court's consideration of officer's

14

view of a federal constitutional protection.  See, e.g., Burch v. Louisiana, 441 U.S. 130 (1979) (reversing state supreme court decision finding conviction by non-unanimous six-person jury for non-petty criminal offense acceptable under Sixth and Fourteenth Amendments); Oregon v. Hass, 420 U.S. 714, 719 (1975) ("[A] State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.") (emphasis and citations omitted).

    The boundaries of what is needed in order to establish probable cause in this Circuit are set forth in Roman and Ribeiro. That is the law this Court must apply.  And while it may be true that were this factual scenario presented to the Rhode Island Supreme Court it would find there was probable cause, such a ruling would be, in this Court's view, legally incorrect.

---

motivation in conducting search on Fourth Amendment grounds, contra Whren v. United States, 517 U.S. 806 (1996)).

15

II. Conclusion

      For the reasons outlined above, the Court DENIES the Government's Motion to Reconsider, ECF No. 56.  However, so as to ensure that the record in this case is accurate, the Court has entered an Amended Order, ECF No. 64.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
District Judge
Date: April 15, 2020