UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
            v.                          )   Cr. No. 18-066 WES
                                        )
ARIEL ALMONTE,                          )
                                        )
            Defendant.                  )
_____ )


**AMENDED MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

I.  Procedural History

    Before the Court is Ariel Almonte's Motion to Reconsider
Defendant's Motion to Suppress Evidence and Reopen Hearing
("Def.'s Mot. Reconsider"), ECF No. 41.  On November 18, 2019, the
Court held a hearing on this motion, at which it heard testimony
from Cranston Police Detective Ronald Fuoroli, as well as argument
from counsel.  The Court granted Defendant's Motion in a Memorandum
and Order entered on January 22, 2020, ECF No. 51.  The Government
subsequently filed a Motion to Reconsider to Correct the Errors in
the Order and to Reconsider the Ruling, ECF No. 56.  In response
to that motion, the Court now issues this Amended Memorandum and
Order, which GRANTS Defendant's Motion to Suppress.  (In a separate
Order, the Court denies the Government's Motion to Reconsider this
ruling, ECF No. 63.  As noted in that Order, however, the Court
agrees with the Government's request to correct one error, and to

1

add several additional facts and some additional context to this opinion.  This Amended Memorandum and Order reflects the changes discussed in the Court's Order denying the Government's motion.)

II.  Findings of Fact[1]

On February 28, 2018, while conducting surveillance in an unmarked vehicle at a local McDonald's, Detective Daniel Dempsey of the Cranston Police Department ("CPD") observed what he described as a "hand to hand transaction" -- he saw Almonte get out of his car in the parking lot, walk over to Richard Wiggs, who was inside another car, and "touch hands" briefly with Wiggs.  Jan. 17, 2019 Mot. to Suppress Hr'g Tr. ("Jan. 17, 2019 Hr'g Tr."), ECF No. 27, 144:3-4; 146:22-147:1; 150:21-23; 153:16-18; 166:4-14; 183:14-22.  Det. Fuoroli arrived later as backup and testified that, as he approached to arrest Almonte, he saw Almonte drop a small bag of white powder on the ground.  Id. at 72:1-20.  When questioned, Wiggs stated that he had purchased two $40.00 bags of "heroin with a combination of fentanyl" from Almonte that day and "was just getting ready to use those drugs" when the police approached.[2]  Id. at 24:7-17; 190:13-20; see also id. at 156:16-

---

[1] The Court sets out all the relevant facts in this order.

[2] Wiggs told the police three months later that he had not purchased the drugs from Almonte in the McDonald's parking lot; rather, he had purchased the drugs from him in a different location in Cranston earlier that day, and was meeting him at the McDonald's to return a bag that Almonte had accidentally left in Wiggs' car. Jan. 17, 2019 Hr'g Tr. 123:14-25; 125:10-127:4; 198:16-199:13.

19. Wiggs also told the police that Almonte, whom he knew as "Socio," was his drug dealer.[3]  Id. at 24:7-9; 194:18-21.  The police recovered several phones on Almonte.  Id. at 219:11-13.[4]

At the time of the alleged transaction, Almonte had his eleven-year-old step-daughter, A.T., in the car with him.  Id. at 20:6-12; 22:8-16; 26:1-6.  After Det. Fuoroli detained Almonte, A.T. was demonstrably upset, and Det. Fuoroli asked her some basic questions.  Id. at 85:3-86:10.  He also ran the registration of Almonte's car and determined it was registered to an apartment at 355 Farmington Avenue. Id. at 27:5-19.  Det. Fuoroli then called Williana Pimentel -- A.T.'s mother and Almonte's wife – using a phone number supplied by A.T. and left a message; eventually Pimentel was reached and she came to the McDonald's parking lot.[5] Id. at 26:24-27:4; 30:11-17; 31:4-6; 86:22-23; 87:9 - 88:24.  When Pimentel arrived, she asked another CPD officer twice whether she could leave with A.T. and was told "no" and that she just had to

---

[3] Det. Fuoroli testified that Wiggs described the drugs "Socio" supplied to him as "[h]eroin with a combination of Fentanyl . . . sometimes being really weak or sometimes it would be so strong that it felt like it was going to kill you." Jan. 17, 2019 Hr'g Tr. 24:10-17.  Wiggs also provided a phone number he had for Socio.  Id. at 194:18-24.

[4] Det. Dempsey testified that carrying several phones is an "indicia of a drug dealer."  Jan. 17, 2019 Hr'g Tr. 219:14-16.

[5] It is unclear who finally made contact with Pimentel, as A.T. was also trying to reach her on her phone.  Jan. 17, 2019 Hr'g Tr. 30:22-31:3.

wait, although she was allowed to hold A.T.'s hand through the back window of the car. Id. at 112:24-113:3; 226:23-227:14; 228:14-229:19; Nov. 18, 2019 Def.'s Mot. to Reconsider Hr'g Tr. ("Nov. 18, 2019 Hr'g Tr."), 41:7-16; 66:23-24, ECF No. 50.[6]

Detective Fuoroli then made his first call to the Rhode Island Department of Children, Youth, and Families ("DCYF") hotline, during which he asked Pimentel questions about Almonte and relayed the answers to the hotline operator, including the fact that Almonte was unemployed at that time. Gov't Mem. in Opp'n to Def.'s Mot. Reconsider ("Gov't Opp'n"), ECF No. 46-1, Ex. 2(A), at 4-5, 9:13-15; Nov. 18, 2019 Hr'g Tr. 18:24-19:2; 21:3-22:21; 27:14-19. During that same call, the hotline operator and Det. Fuoroli discussed what the next steps would be regarding A.T. Gov't Opp'n, Ex. 2(A), at 9:23-10:7. The hotline operator said, "[a]s it stands right now, [A.T. is] probably going . . . back to the mother because . . . she's not going to be arrested. But if you find any drugs in that house . . . things might change." Id. at 9:24-10:4.

---

[6] The chronology of events is somewhat unclear, due to Det. Fuoroli's stated inability to recall exact details, and the contradictions between his testimony at the first hearing on the Motion to Suppress and the call recordings from DCYF that have since been received into evidence. See Def.'s Mot. Reconsider; Gov't Opp'n, Ex. 2(A); see also Nov. 18, 2019 Hr'g Tr. 13:15-17; 18:12-16; 23:7-12; 65:21-66:2 (Det. Fuoroli testified that he was "not exactly clear when [Pimentel] arrived, but shortly thereafter I was on the phone with DCYF . . . .").

Det. Fuoroli responded that he would call the hotline back. Id. at 10:5-23.

After the call was over, Pimentel again asked if she could leave with A.T. and was told no.[7]  Jan. 17, 2019 Hr'g Tr. 229:15-19; Nov. 18, 2019 Hr'g Tr. 66:10-68:1.  Det. Fuoroli informed her that her husband had been caught engaging in a narcotics transaction, and asked Pimentel who she lived with; she responded that she lived on the first floor of 355 Farmington with her husband Ariel and her daughter.  Jan. 17, 2019 Hr'g Tr. 37:2-16. Det. Fuoroli then asked her if there were any weapons or narcotics at the home and she replied that "she didn't think so . . . [and] [t]hat [Almonte] used to have a drug problem and that he was recently sick."[8]  Nov. 18, 2019 Hr'g Tr. 70:25-71:5.

---

[7] It is unclear if at this point Pimentel asked Det. Fuoroli or a different police officer on the scene.  See Jan. 17, 2019 Hr'g Tr. 229: 15-19; Nov. 18, 2019 Hr'g Tr. 66:10-68:1.  Det. Fuoroli testified that Pimentel was refused permission to leave with her child at least twice, and that he did so because he "didn't hear back from DCYF to see what they wanted to do regarding the incident." Jan. 17, 2019 Hr'g Tr. 101:15-24; 112:24 – 113:3. At the November 18, 2019 Hearing, Det. Fuoroli testified that Pimentel could not leave because "we were still investigating the incident" and that his previous testimony that he was waiting for DCYF instructions was "inaccurate." Nov. 18, 2019 Hr'g Tr. 67:18-68:8.

[8] Det. Fuoroli also testified at the January 17, 2019 hearing that Pimentel said she "wasn't sure" if there were drugs or weapons at the house and that she "didn't believe" there were any.  Jan. 17, 2019 Hr'g Tr. 37:24-38:6; 128:23-129:1.
Additionally, according to Det. Fuoroli, Pimentel relayed the information about Almonte's drug problem before she gave her consent to search the apartment she shared with Almonte. Nov. 18,

Det. Fuoroli then asked Pimentel for her consent to search her apartment, and she initially "huffed and puffed" and was "reluctant" to do so. Jan. 17, 2019 Hr'g Tr. 40:9-25; 106:8-21; 230:13-17. Det. Fuoroli told Pimentel "it would probably be in the best interest of the child that there be no harmful narcotics in the apartment . . . ." Jan. 17, 2019 Hr'g Tr. 38:20-23; see also Jan. 17, 2019 Hr'g Tr. 108:20-109:3. Det. Fuoroli also testified that he told Pimentel that DCYF had been called and that DCYF "was not going to allow her to take that child back to her home until it had been searched and made safe or made secure . . . ." Nov. 18, 2019 Hr'g Tr. 29:22-30:5; 33:6-11; see also Jan. 17, 2019 Hr'g Tr. 108:20-109:3; 136:4-10; 138:24-139:1; 140:22-141:4. However, in the recording of that call that was obtained later, the DCYF hotline operator told Det. Fuoroli "[a]s it stands right now, [A.T. is] probably going to [go] back to the mother . . . ."[9] Gov't Opp'n Ex. 2(A), at 9:24-10:2. According to Pimentel, Det. Fuoroli told her that if she did not sign "they were going to take my daughter

---

2019 Hr'g Tr. 70:25-72:2.  Pimentel's testimony was she did not tell Det. Fuoroli that information until after she had signed the consent form.  Jan. 17, 2019 Hr'g Tr. at 254:10-17.

[9] At the Nov. 18, 2019 hearing, Det. Fuoroli testified that he could only explain the inconsistencies between his original testimony and the call recordings as "memory lapse[s]." Nov. 18, 2019 Hr'g Tr. 9:24-25; 11:7-11.

away," and that he did not mention DCYF.  Jan. 17, 2019 Hr'g Tr. 232:18-21; 238:17-18; 255:13-14.

Pimentel asked how the search would be conducted and Det. Fuoroli explained that CPD officers would not "tear apart the apartment [or] break anything" and that she could "be present during the search." Id. at 39:3-12. According to Det. Fuoroli, Pimentel "huffed and puffed a little bit," and said "[f]ine or [o]kay . . . ." Id. 39:14-16. Det. Fuoroli brought over a written consent form, which he read to Pimentel.  Id. at 41:1-4; 42:3-4. Pimentel asked Det. Fuoroli what would happen if she did not consent, and he replied that "more than likely we would have to secure the apartment and we may apply for a search warrant."  Id. at 42:12-13. Pimentel then signed the consent form. Id. at 43:3-4. After she did so, Pimentel was allowed to leave with A.T. and the officers followed them to their residence to execute the search of the apartment.[10]  Id. at 113:12-20.   Pimentel was at the

---

[10] Det. Fuoroli originally testified that he called DCYF again before leaving the scene, but there is no record of any such call. See Jan. 17, 2019 Hr'g Tr. 43:16-44:2; 106:1-3; Nov. 18, 2019 Hr'g Tr. 43:3-13. The call recordings reflect a first call to DCYF made from the McDonald's parking lot, Gov't Opp'n Ex. 2(A), ECF No. 46-1, and then three more calls made during the search of Almonte's residence.  Gov't Opp'n Exs. 2(B), 2(C), ECF Nos. 46-2, 46-3; Gov't Ex. 1D, Nov. 18, 2019 Hr'g; see also Nov. 18, 2019 Hr'g Tr. 22:25-23:12.

A transcript of the fourth call is not attached to the Government's Opposition to Defendant's Motion to Reconsider and Reopen. That transcript was admitted as "Government's Exhibit 1D" at the hearing after the audio recording of the call (Exhibit 1D) was played.  Nov. 18, 2019 Hr'g Tr. 58:15-59:7. That is why it is

McDonald's parking lot for around ten minutes total. Id. at 44:17-20.

During the search of Almonte's residence, CPD officers seized heroin, fentanyl, marijuana, various drug paraphernalia, a firearm, and $942.00 in cash, all of which was used to charge Almonte with possession with intent to distribute fentanyl and possession of a firearm in furtherance of drug trafficking. Gov't Mem. in Supp. of Obj. to Def's Mot. to Suppress ("Gov't Mem.") 6-7, ECF No. 20-1; see Indictment, ECF No. 9; see also Criminal Compl., ECF No. 1. In the middle of the search, Det. Fuoroli called the DCYF hotline and informed the same male operator of the drugs that had been found, and the operator said he would "write it up." Gov't Opp'n Ex. 2(B), ECF No. 46-2, at 3:11-15, 5:16-17. After the firearm was found, the DCYF operator called Det. Fuoroli back, Det. Fuoroli informed him of the discovery of the firearm, and the operator told him that DCYF was sending somebody to the house. Gov't Opp'n Ex. 2(C), ECF No. 46-3, at 3:14-16, 4:9-11. A little less than two hours after that third call, Det. Fuoroli made a fourth call to DCYF, during which he spoke to a different, female, operator, who did not seem aware of what had transpired in the previous calls and indicated that he should leave A.T. with

---

cited here in this fashion, and the other call transcripts are cited as 2(A), 2(B), and 2(C).

Pimentel.  Jan. 17, 2019 Hr'g Tr. 49:23-50:20; Nov. 18, 2019 Hr'g
Tr. 58:15-59:9; Gov't Ex. 1D. Eventually, a DCYF representative
did arrive and she removed A.T. from the home.  Jan. 17, 2019 Hr'g
Tr. at 237:5-25.

III.  Standard of Review

A motion to reconsider should be granted "if the moving party
presents newly discovered evidence, if there has been an
intervening change in the law, or if the movant can demonstrate
that the original decision was based on a manifest error of law or
was clearly unjust." United States v. Allen, 573 F.3d 42, 53 (1st
Cir. 2009).  Additionally, the Court has discretion to reconsider
its own ruling.  Pickett v. Prince, 207 F.3d 402, 407 (7th Cir.
2000) ("[A] motion to reconsider a ruling is constrained only by
the doctrine of the law of the case. And that doctrine is highly
flexible, especially when a judge is being asked to reconsider his
own ruling.") (emphasis omitted).  Here, for the reasons explained
herein, there are good grounds to reconsider.

IV.  Discussion

A.   Whether Pimentel's Consent Was Voluntary

Consent is an exception to the Fourth Amendment's prohibition
on government searches of a person's residence without a warrant.
Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).  Consent may be
obtained from an occupant or "a third party who possesses common
authority over the premises." Id.  It is undisputed that Pimentel,

as Almonte's wife and a cohabiter of the apartment, had authority to consent to a search of the residence; the question is whether she was coerced into providing that consent, such that it was not voluntarily given.

The government bears the burden of proving by a preponderance of the evidence that consent to search was voluntarily given. Lego v. Twomey, 404 U.S. 477, 489 (1972).  Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker"; it cannot be the result of coercion, either express or implied.  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).  In assessing voluntariness, courts examine the following factors, although none of them are dispositive: "(i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics." United States v. Perez-Diaz, 848 F.3d 33, 39 (1st Cir. 2017) (quoting United States v. Vanvliet, 542 F.3d 259, 264 n.2 (1st Cir. 2008)).

Courts have long recognized that the "psychological coercion generated by concern for a loved one" can affect a person's "capacity for self control."  United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) (internal citation omitted).  The "mere fact that a defendant is placed under some psychological pressure

10

by agents does not necessarily render a confession involuntary." United States v. Jacques, 744 F.3d 804, 811 (1st Cir. 2014) (quotation marks and internal citations omitted). However, "[w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert . . . 'improper influence.'" Tingle, 658 F.2d at 1336 (quoting Molloy v. Hogan, 378 U.S. 1, 7 (1964)); see also United States v. Tibbs, 49 F. Supp.2d 47, 53 (D. Mass. 1999) (finding it "more likely than not that the police said to [defendant's girlfriend] perhaps the one thing guaranteed to secure her consent, that her child would be taken away if she did not consent . . . . Once they threatened her child, there was no question that she would succumb – hardly voluntarily."). The question here then is whether what Fuoroli said to Pimentel was enough to cross the line from "some psychological pressure" to "improper influence."

In its original Memorandum and Order denying Almonte's Motion to Suppress, this Court unequivocally credited Det. Fuoroli's testimony that he told Pimentel that DCYF would not let her back into the apartment until they were satisfied there was nothing harmful for the child there. Apr. 1, 2019 Mem. and Order 11, ECF No. 32 ("April 2019 Order") ("[B]ased on all the other facts and circumstances in which this threat was allegedly made, the Court does not find [Pimentel's] testimony credible; instead, it credits

Det. Fuoroli's version of events."). As described above, subsequent to the Court's original decision it became apparent that the recordings of the calls between Detective Fuoroli and DCYF existed. Once these recordings were obtained and introduced into evidence at the hearing on Defendant's Motion for Reconsideration, and after considering Det. Fuoroli's testimony at the hearing, the Court is no longer confident that Det. Fuoroli's initial testimony as to what he told Pimentel is accurate.[11] However, the Court also does not find Pimentel's version of events -- that Det. Fuoroli said he would take her child away if she withheld consent -- entirely credible either. Jan. 17, 2019 Hr'g Tr. 230:13-20.

What the Court does know, from the call recordings, is that Det. Fuoroli was not merely repeating to Pimentel what DCYF told him on the phone.[12] In fact, he made a subtle but significant

---

[11] To be absolutely clear – the Court does not think that Det. Fuoroli deliberately lied – rather it is now clear that he was unable to accurately remember and recount the conversations he had with Pimentel and DCYF. For example, Det. Fuoroli stated that the DCYF operator "told me straight out that the child is not going to go back to the house until we're sure there's nothing harmful," Jan. 17, 2019 Hr'g Tr. 138:24–139:1, that he "definitely" remembered DCYF telling him that "they wouldn't let her child back into that house or that apartment," id. at 140:22–141:4, and that "DCYF told [him] that . . .they could not let that child back into the apartment until it was deemed safe," id. at 141:22-25. See also infra nn. 5,7,8.

[12] The Court's belief in the accuracy of Det. Fuoroli's comments to Pimentel were a significant factor in the Court's original ruling. April 2019 Order 11 ("When Pimentel asked him

change:  DCYF informed him that "[a]s it stands right now, [A.T.
is] probably going to [go] back to the mother," but Det. Fuoroli
told Pimentel that DCYF "was not going to allow her to take that
child back to her home until it had been searched and made safe or
made secure."  Gov't Opp'n Ex. 2(A), at 9:24–10:2; Nov. 18, 2019
Hr'g Tr. 29:25–30:5.  Det. Fuoroli changed A.T.'s default status
from going back to her mother <u>unless</u> something harmful was found
in the house to <u>not</u> going back to Pimentel <u>until</u> the house was
cleared.  This shift by Det. Fuoroli makes the tactic more coercive
than if he had merely parroted what DCYF had told him.  <u>See</u> <u>Janusiak</u>
<u>v. Cooper</u>, 937 F.3d 880, 891–92 (7th Cir. 2019) (holding that the
police can speak truthfully about the likely consequences for
children when a parent is arrested but "any statements about a
child's custody should not be false; otherwise the suspect's will
may be overborne . . . ."); <u>United States v. Ivy</u>, 165 F.3d 397,
403 (6th Cir. 1998) (finding that the "unequivocal[]" statement
made by the police that if defendant did not consent to the search,
his child would go into state custody, was not accurate and
therefore was "not merely trying to provide [defendant] with data

---

directly if they were going to take A.T. away, Det. Fuoroli
<u>truthfully</u> responded . . . .")(emphasis added); <u>id.</u> at 12 ("Here,
Det. Fuoroli did not use the specter of removing A.T. to 'prey' on
Pimentel's maternal instinct; rather, he conveyed <u>accurate</u>
information based on what he knew from DCYF at the time.")
(emphasis added).  In light of the recordings, these conclusions
were obviously incorrect.

upon which to base his decision to consent, but rather was attempting to overcome [his] resolution <u>not</u> to consent.") (emphasis in original).   This is especially so when the Court considers the possibility, as discussed above, that Det. Fuoroli's actual words to Pimentel may have veered closer to a threat than what he admitted or recalled.[13]

Pimentel's subjective understanding, provided it was reasonable, is another factor in determining whether her consent was voluntary.   See <u>Tingle</u>, 658 F.2d at 1336 ("We think it clear that the purpose and objective of the interrogation was to cause [the defendant] to fear that, if she failed to cooperate, she would not see her young child for a long time . . . such would be the conclusion which [the defendant] could reasonably be expected to draw from the agent's use of this technique"); <u>United States v. Harvey</u>, No. 3:07-CR-00103-RRB-DMS, 2008 WL 11395588, at *9 (D. Alaska Apr. 1, 2008) ("The court has to look at the subjective state of the person who consents and must look at the reasonableness of their fear.").   Pimentel's stated understanding was that the police were going to take her child away if she did not sign the consent form, and that she had to sign the form in order to leave with A.T.   Jan. 17, 2019 Hr'g Tr. 230:13-231:4;

---

[13] None of this is to suggest that in the event DCYF had said it wanted the home searched, law enforcement would be permitted to use this with impunity.   This issue is not before the Court.

232:12-24; 238:13-24.  This subjective belief was not unreasonable where Pimentel had already asked multiple times if she could leave with her child and was refused, and where there is no evidence that she had prior experience with the police or the criminal justice system.  Id. at 101:15-24; 112:24-113:3; 226:23-227:14; see also United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) (noting that defendants who lack familiarity with the criminal justice system may be particularly "susceptible to psychological coercion").

In considering whether Pimentel's consent was involuntary, United States v. Bey, 52 F. Supp. 3d 299 (D. Mass. 2014), aff'd, 825 F.3d 75 (1st Cir. 2016), is instructive.  In that case, while the police were executing a warrant for defendant's arrest at the home of Clarissa Summons, they attempted to obtain her consent to search the home.  Bey, 52. F. Supp.3d at 301, 305.  Summons's son also lived there and was present at the time of the arrest.  Id. The officer who first spoke with Summons mentioned contacting child protective services, but did not refer directly to the possibility of removing her son from the home; following that conversation, another officer brought over a "consent to search" form and asked her permission to search the premises.  Id. at 301.  Summons was told that she was free to withhold consent, but that if she did, she and her son would have to leave for several hours while police

15

secured the home and obtained a warrant.   Id. at 301-02.   She signed the consent form.   Id. at 302.

    The District Court found Summons' consent was voluntarily given.   Id. at 305.   The Court explained that the officer never referenced the possibility that Summons's son could be removed from the home or "linked the consent to search with any threats or promises relating to" child protective services and, on the contrary, the officer "sat down with Summons and carefully described the terms of the consent form to her . . . she did not manifest any noticeable angst, apprehension, or anxiety when she signed the form."   Id.

    That scenario is markedly different from what occurred here. Even taking Det. Fuoroli's testimony at face value, he referenced the possibility that DCYF "would not let [A.T.] go back to the house," and explicitly linked that possibility to Pimentel's consent to search.   Jan. 17, 2019 Hr'g Tr. 136:4-10; see also Nov. 18, 2019 Hr'g Tr. 29:22-30:5.   While Det. Fuoroli testified that he read the search form to Pimentel, it must have been done very briefly, since he also testified Pimentel was only at the scene for a total of ten minutes.   Jan. 17, 2019 Hr'g Tr. 42:3-4; 44:17-20.   And Pimentel, unlike Summons, showed signs of angst and anxiety when she refused consent at first and "huffed and puffed and . . . gave [Det. Fuoroli] a stare."   Id. at 106:20-23.

16

Therefore, in evaluating the case law and applying it to the totality of the circumstances here, particularly the Court's new understanding that Det. Fuoroli's statements to Pimentel were at odds with what DCYF actually told him, the Court finds that Pimentel's will was overborne by Det. Fuoroli's coercive tactics and thus her consent to search was not voluntarily given.[14]

B.   Inevitable Discovery

In its original Order denying the Motion to Suppress, this Court found that, even without Pimentel's consent, the contraband recovered from Almonte's residence would inevitably have been discovered when the police applied for and were granted a search warrant.  April 2019 Order 13.  The Court also reverses its ruling on this point, finding that its previous ruling was an error of law.  See Allen, 573 F.3d at 53.

The inevitable discovery doctrine provides:

> Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, so as long as (i) the lawful means of its discovery are independent and would necessarily have been employed; (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a

---

[14] The Court does not disturb its previous ruling that Pimentel's temporary detention was a reasonable exercise of the CPD officers' "community caretaking function."  See United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006) (aiding those in distress, combatting actual hazards and preventing potential hazards from materializing are some of the community caretaking functions); see also April 2019 Order 10 n.2.

> particular case will not sully the prophylaxis
> of the Fourth Amendment.

United States v. Lee, Cr. No. 17-120 WES, 2018 WL 3873668, at *8 (D.R.I. Aug. 15, 2018) (quoting United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994)).  The parties agree that if Pimentel had not consented (or because her consent was involuntary) the only alternative "lawful means" available to CPD officers in this case was to obtain a search warrant for Almonte's home.

A search warrant application must reveal probable cause to believe two things: (1) "that a crime has occurred" and (2) "that specified evidence of the crime will be at the search location." United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016); see U.S. Const. amend. IV.  When establishing that specified evidence of a crime will be at the search location, the magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Although "a law enforcement officer's training and experience may yield insights that support a probable cause determination," the First Circuit has held that police must provide additional "specific facts connecting the drug dealing to the home" to establish probable cause for searching the defendant's

residence.   United States v. Bain, 874 F.3d 1, 23-24 (1st Cir.
2017)   (quotation   marks   and   internal   citation   omitted).
Additionally, regardless of whether probable cause existed at the
time, the Court must determine whether or not CPD officers would
have actually sought a search warrant for the residence, and the
Court finds they would have done so in this case.   See United
States v. Finucan, 708 F.2d 838, 843 (1st Cir. 1983); see also
Jan. 17, 2019 Hr'g Tr. 124:10-15.

This Court based its original ruling on the following facts
that it found Detectives Fuoroli and Dempsey were aware of after
Almonte's arrest and before Pimentel signed the consent form:

> that Almonte had been observed engaging in a
> "hand to hand" narcotics transaction with
> Wiggs; that Wiggs had given a formal written
> statement explaining that he had just
> purchased drugs from Almonte; that Almonte had
> dropped a baggie full of drugs on the ground
> when officers approached; that Almonte had
> executed the drug transaction in front of his
> eleven-year-old stepdaughter; and that
> Pimentel denied the presence of narcotics or
> weapons in the home,[15] but admitted that
> Almonte had a history of drug addiction and
> had recently been "drug sick."

April 2019 Order 15-16.

---

[15] The Court's characterization in its April 2019 Order was
not entirely accurate.   The Court notes in the "Findings of Fact"
section of the instant Order that Pimentel did not unequivocally
deny the presence of narcotics or weapons in the home.   See infra
p. 5 and note 8.

In this Amended Order, the Court also considers these additional facts: that Almonte had several phones on him when he was arrested, that Almonte was unemployed, that Wiggs told the police that Almonte (whom he referred to as "Socio") was his drug dealer, and that Wiggs described the type of drugs Almonte supplied and provided a phone number for him. Jan. 17, 2019 Hr'g Tr. 24:7-17; 194:18-24; 219:11-16; Nov. 18, 2019 Hr'g Tr. 27:14-19.   The Court also takes into account that Det. Fuoroli, who has extensive experience in narcotics investigations, testified that he had "encountered circumstances . . . where individuals who distribute narcotics maintain evidence of that narcotics trafficking at their residence," and that he would have included this in an affidavit for a search warrant. Id. at 6:21-7:14; 130:2-13.

However, courts have held that, in order to obtain a search warrant for a residence, to support the inference that there will be drugs or other contraband in the home, some additional evidence is required to establish a nexus between the drug dealing and the home beyond "general information from police officers that drug dealers tend to store evidence in their homes." Bain, 874 F.3d at 23-24; see also Rivera, 825 F.3d at 66 ("We might very well have reached a different result had a commonsense reading of the evidence not indicated that [the defendant] participated in a drug-related phone call from his home. But with that inference, there is enough probable cause to believe evidence of his drug-pushing

activities would be at his house."); United States v. Barnes, 492
F.3d 33, 37 (1st Cir. 2007) ("Here, given both that the CI stated
that [the defendant] lived at the . . . residence and that the
police observed [the defendant] exit the . . . residence, drive
away, and sell drugs on the day of his arrest and the search, the
totality of the circumstances strongly suggested that there was
evidence of drug dealing at the . . . residence."); United States
v. Ribeiro, 397 F.3d 43, 52 (1st Cir. 2005) (finding nexus
established from drug dealing to residence where the police were
"virtually certain" defendant left his house carrying the drugs he
was about to sell); United States v. Brandao, 270 F. Supp. 3d 485,
490 (D. Mass. 2017) (finding enough nexus to residence for probable
cause where police observed that on three of the four controlled
buys, the defendant left the residence shortly after making contact
with the undercover detective and went directly to the location of
the drug transaction).

     In one of the most recent cases on the subject, United States
v. Roman, 942 F.3d 43 (1st Cir. 2019), the First Circuit explained
that, while a "nexus" between evidence sought and the place to be
searched "need not, and often will not, rest on direct observation,
but rather can be inferred . . . we have not permitted this
inference to be applied lightly." Roman, 942 F.3d at 51 (quoting
Feliz, 182 F.3d at 88). The First Circuit was explicit: "[w]e
have rejected a per se rule automatically permitting the search of

a defendant's home when he has engaged in drug activity." Id. Specifically, the Court noted that "generalized observations" such as general information from police officers regarding where drug dealers store drugs "should be 'combined with specific observations' or facts 'connecting the drug dealing to the home' to permit an inference of nexus to a defendant's residence." Id. at 52 (quoting Ribeiro, 397 F.3d at 50-51[16]; Bain, 874 F.3d at 24).

The First Circuit then found that police had not shown the required "nexus" where the warrant affidavit "contain[ed] no specific facts or observations connecting [defendant's] alleged drug activity to his home . . . it fail[ed] to even on one occasion place [the defendant] himself at the residence, let alone in connection with drug crimes." Id. Accordingly, that Court found there was no probable cause to search defendant's residence and the fruits of the search had been properly suppressed. Id. at 55.

Here, the police knew the following facts about Almonte at the time they would have applied for a search warrant: he had sold drugs to Wiggs; dropped a bag of drugs on the ground; brought his stepdaughter A.T. with him to that drug transaction after picking

---

[16] The First Circuit in Ribeiro specifically noted that general observations from police in a warrant affidavit as to where drug dealers store contraband "contribute[ed] significantly to the probable-cause determination" when they were "combined with specific observations about Ribeiro's movements back and forth from his residence in relation to drug transactions . . . ." 397 F.3d at 50-51.

her up from school; was known to Wiggs as a drug dealer named Socio; had several phones on him at the time of his arrest; and was unemployed. Jan. 17, 2019 Hr'g Tr. 24:7-9; 72:1-73:13; 194:18-24; 200:7-8; 219:11-16; 260:6-11; Nov. 18, 2019 Hr'g Tr. 27:14-19. Further, Pimentel "didn't think" there were drugs or weapons in the house, and Almonte used to have a drug problem and had recently been "sick." Nov. 18, 2019 Hr'g Tr. 70:25-71:5; see also Jan. 17, 2019 Hr'g Tr. 37:24-38:6; 128:23-129:1.

None of the above facts constitutes a "specific observation[]" or fact that would "connect" Almonte's drug dealing and his home, as required by Roman. 942 F.3d at 52. Pimentel's description of Almonte as "drug sick" does not establish a sufficient nexus between his drug selling (as opposed to using) and his residence.[17] Almonte's alleged drug usage, and whatever sickness it caused him, is irrelevant to what would have been the basis of the search warrant – Almonte's alleged sale of drugs to Wiggs and the possibility of contraband related to that sale being in his residence. And while Wiggs had bought drugs from Almonte

---

[17] Notably, it is not clear that Pimentel ever actually used the phrase "drug sick" to describe Almonte. Det. Fuoroli testified that she stated that "her husband used to have a drug problem in the past and that he had recently been sick", and her testimony does not contradict that. Jan. 17, 2019 Hr'g Tr. 38:4-12; 254:10-17. Additionally, it is possible that Pimentel did not even tell Det. Fuoroli about Almonte being sick until after she signed the consent form. Id. at 254:10-17.

before, and had his phone number, he did not indicate to police that he knew where Almonte lived or that he had ever bought drugs from his house, and Pimentel "didn't think" that there were drugs or weapons in the house.[18] Nov. 18, 2019 Hr'g Tr. 70:25–71:5.

The only evidence that directly connected Almonte's alleged drug transaction to his residence is the fact that he had his stepdaughter A.T. with him at the time, whom he had picked up from school.  Jan. 17, 2019 Hr'g Tr. 200:7; 260:6-11.  The police did not witness Almonte going to or from his house before or after an alleged drug transaction took place, nor did any confidential informant or other source see such activity or purchase drugs from Almonte's home. See id. at 132:20-23. The police never witnessed Almonte making drug-related phone calls from his house. In weighing the evidence, the Court finds that, while this is arguably a close call, the lack of evidence connecting the drug activity to Almonte's house makes this case most analogous to Roman.[19]

_____

[18] While it has no bearing on what the police knew at the time, at an interview with police three months later, Wiggs stated that he did not know where Almonte lived, although he assumed it was somewhere in the area of Farmington Avenue because that is where he met him, and that he had never purchased drugs from his home. Jan. 17, 2019 Hr'g Tr. 132:11-19.

[19] In United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999), the First Circuit did hold that it could be reasonably inferred that a defendant kept information related to his drug transactions in his residence, even without direct observation. However, Feliz is distinguishable because there, the police had reliable detailed information that the defendant had a twelve-year career in drug trafficking.  See id. at 87.

24

The Court finds that law enforcement could not have shown a sufficient nexus between Almonte's alleged drug transaction and his residence that would have enabled them to meet the probable cause standard for a search warrant. Therefore, the evidence recovered from Almonte's residence is suppressed.

V.   Conclusion

For the reasons stated herein, the Court GRANTS Defendant's Motion to Reconsider Defendant's Motion to Suppress Evidence and Reopen Hearing, ECF No. 41, finding that Williana Pimentel's consent to search the apartment she shared with Ariel Almonte was not voluntarily given, and that the independent discovery of the contraband from that home was not inevitable. The Court's order denying the Defendant's Motion to Suppress set forth in the April 1, 2019 Memorandum and Order, ECF No. 32, is VACATED. Defendant's Motion to Suppress, ECF No. 18, is hereby GRANTED; the evidence seized from Defendant's residence incident to the search conducted on February 28, 2018 is suppressed.

IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date: April 15, 2020

25